The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date: June 11, 2025

**No. A-1-CA-41455**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**BAKARI SHARIF GARRETT,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Douglas R. Driggers, District Court Judge**

Raúl Torrez, Attorney General
Santa Fe, NM
Serena R. Wheaton, Assistant Solicitor General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**WRAY, Judge.**

{1}     During an apparent drug deal involving four people, multiple shots were fired and one individual was killed. A jury convicted Defendant on two counts: (1) one count of aggravated assault with a deadly weapon, contrary to NMSA 1978, Section 30-3-2(A) (1963); and (2) one count of attempt to commit armed robbery, contrary to NMSA 1978, Section 30-28-1 (1963, as amended through 2024) (attempt) and NMSA 1978, Section 30-16-2 (1973) (robbery). The jury also found by special interrogatory that Defendant used a firearm in the commission of the aggravated assault, and at sentencing, the district court applied the firearm enhancement authorized by NMSA 1978, Section 31-18-16(A) (2020, amended 2022).[1] On appeal, Defendant argues, and we agree, that the convictions were based on a single act of threatening the victim (Victim) with a firearm and that multiple punishments for that act violate his right to be free from double jeopardy. As a result, the aggravated assault conviction and associated firearm enhancement must be vacated. We therefore reverse on each issue and remand for resentencing.

---

[1]Section 31-18-16(A) was amended in 2022 but throughout this opinion, we refer to the 2020 version of the statute that was applicable at the relevant time.

## BACKGROUND

{2}     In the days leading up to January 29, 2022, Defendant arranged to purchase a large quantity of marijuana from Victim. Because Defendant and Victim did not know each other, Victim's friend, Matthew Portalanza,[2] relayed information between Defendant and Victim. Before the drug deal happened, Defendant and another individual, identified in the record as Jacorven Deshawn Ousley, went to Mr. Portalanza's house to discuss the details of the proposed deal, and Defendant "was asking about guns, and if [Mr. Portalanza's] people had guns." Mr. Portalanza told him, "Yes, because my people are protected."

{3}     On the day of the deal, Defendant and Mr. Ousley picked up Mr. Portalanza, and the three men drove to the arranged location. As the three men waited ten to fifteen minutes for Victim to arrive, Defendant sat in the driver's seat, Mr. Ousley in the passenger seat, and Mr. Portalanza in the back passenger-side seat. When Victim arrived, he sat behind Defendant in the rear driver's-side seat. Mr. Portalanza testified that the interaction between the four men in the car "seemed pretty smooth at first until [Defendant] asked to see the product." At that point, Victim passed a vacuum-sealed bag of marijuana forward to Defendant, and Defendant "pretended to check it out" for "not even like ten minutes." Defendant then "proceed[ed] to step

---

[2]Mr. Portalanza testified for the State at Defendant's trial, and the vast majority of our factual recitation is drawn from his eyewitness testimony.

out [of] the car with his hand in his pants and pull[ed] out a gun." Defendant pointed the gun at Victim through the window of the car and told him to get out.

{4}    What transpired next between Defendant and Victim "happen[ed] pretty fast." Victim got out of the car, "kind of panicked," pulled out his own gun, and Defendant and Victim "started exchanging shots." Mr. Portalanza testified that he was certain that Defendant was the first to shoot. The gunfire did not stop until both Defendant and Victim "ran out of clips." Once the shooting stopped, Defendant and Mr. Ousley quickly drove away, while Mr. Portalanza remained at the scene, attempted to render aid to Victim, and called 911. Victim died at the scene as a result of the gunshot wounds he sustained during the shooting. Police later recovered a bag of marijuana from Defendant's apartment, which was consistent with Mr. Portalanza's description of "the product."

{5}    As a result of the series of events described above, Defendant was indicted on one count of first degree murder, one count of aggravated assault with a deadly weapon, one count of attempt to commit armed robbery, and one count of conspiracy to commit armed robbery. After the State rested its case at trial, the district court granted the State's requests to conform its original theories to the evidence presented during the case in chief. The district court first allowed the State to amend the indictment from first to second degree murder and then directed a verdict in favor of Defendant on the newly-amended second degree murder count and the conspiracy

count for lack of sufficient evidence. The district court also allowed the State to shift from a theory of aggravated assault with a deadly weapon that was based on Defendant shooting at Victim, *see* UJI 14-304 NMRA (aggravated assault by attempted battery with a deadly weapon), to a theory based on Defendant threatening or menacing Victim with a firearm, *see* UJI 14-305 NMRA (aggravated assault by threat or menacing conduct with a deadly weapon). The State's revised theory of the aggravated assault arose from Mr. Portalanza's testimony, which the State characterized during its argument to shift its theory of the aggravated assault as follows: "Defendant had gotten out of his car and in one fell swoop pulled the gun and stuck it at [Victim] and began to menace him with it" and "instructed [Victim] out of the car."

{6}     Defendant was convicted on the two counts that were submitted to the jury—aggravated assault with a deadly weapon and attempt to commit armed robbery. Using a special interrogatory, the jury found beyond a reasonable doubt "that a firearm was *used* in the commission of aggravated assault with a deadly weapon." The district court enhanced Defendant's sentence for the aggravated assault conviction by three years based on the jury's finding that a firearm was used in the commission of that crime. Defendant ultimately received a sentence of three years, five months, and nine days for the aggravated assault conviction, to run concurrently

with a three-year sentence for the attempt to commit armed robbery conviction. Defendant appeals.

**DISCUSSION**

{7}    Defendant raises three issues on appeal: (1) whether punishment for the two convictions violated double jeopardy; (2) which conviction must be vacated if there was a double jeopardy violation; and (3) whether the district court lacked statutory authority to apply the firearm enhancement. We address each issue in turn.

**I.    Double Jeopardy**

{8}    Defendant contends that he was unconstitutionally subjected to multiple punishments for the same conduct under two different statutes. *See Swafford v. State*, 1991-NMSC-043, ¶¶ 8-9, 112 N.M. 3, 810 P.2d 1223 (describing double description cases). In *Swafford*, our Supreme Court adopted a two-part test for analyzing double description challenges. *Id.* ¶ 25. The first part of the double description test requires us to ask "whether the conduct underlying the offenses is unitary, i.e., whether the same conduct violates both statutes." *Id.* If the conduct is unitary, we move on to the second part of the test, which "focuses on the statutes at issue to determine whether the [L]egislature intended to create separately punishable offenses." *Id.* Defendant contends that the sentences violate double jeopardy protections because (1) "[b]oth convictions punish the same act of pointing a gun at [Victim]"; and (2) "the [L]egislature only intended punishment for the greater of the two felonies."

{9}     We review both aspects of Defendant's argument de novo. Whether conduct is unitary presents "a mixed question of law and fact." *State v. Armijo*, 2005-NMCA-010, ¶ 15, 136 N.M. 723, 104 P.3d 1114 (internal quotation marks and citation omitted). Legislative intent is further "a legal question involving scrutiny of the elements of the statutes in question." *Id.* (internal quotation marks and citation omitted); *see State v. Franco*, 2005-NMSC-013, ¶ 14, 137 N.M. 447, 112 P.3d 1104 (explaining that we must "look at the legal theory of the offense that is charged" in certain cases because appellate courts "treat statutes written in the alternative as separate statutes" to avoid "misconstruing legislative intent" (internal quotation marks and citation omitted)). Because the statutory elements of both aggravated assault with a deadly weapon and attempt to commit armed robbery incorporate definitions provided by the Legislature in multiple statutes, we must briefly piece together the statutory elements of those offenses before considering those elements in the context of each part of the double-description test.

**A.     The Statutory Elements**

{10}     Assault can be committed in a variety of ways and aggravated assault includes an additional element. In relevant part, assault is defined as either "an attempt to commit a battery upon the person of another"; or "any unlawful act, threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery." NMSA 1978, § 30-3-1(A), (B) (1963).

Thus, for our purposes, assault can involve an attempted battery,[3] *see* NMSA 1978, § 30-3-4 (1963) (defining "battery" as "the unlawful, intentional touching or application of force to the person of another, when done in a rude, insolent or angry manner"), or threatening or menacing conduct, *see* § 30-3-1(A), (B). Aggravated assault, in relevant part, includes "unlawfully assaulting or striking at another with a deadly weapon." Section 30-3-2(A).[4]

{11} Attempted armed robbery includes two parts. An "[a]ttempt to commit a felony consists of an overt act in furtherance of and with intent to commit a felony and tending but failing to effect its commission." Section 30-28-1. The felony in the present case was defined by the robbery statute, which states, in relevant part, that "[r]obbery consists of the theft of anything of value from the person of another or from the immediate control of another, by use or threatened use of force or violence."

---

[3]We note that a conviction for aggravated assault with a deadly weapon may be upheld even when the battery is completed. *See State v. Brito*, 1969-NMCA-027, ¶¶ 1, 9, 80 N.M. 166, 452 P.2d 694 (affirming a conviction for aggravated assault when the defendant "shot and severely wounded" the victim).

[4]Because the State chose a "threat or menacing" theory of assault rather than attempted battery, for the purposes of aggravated assault, the crime was narrowed to "unlawfully assaulting" to the exclusion of "striking at." We note that under some circumstances, the evidence may support instructing the jury on both unlawfully assaulting *and* striking for the purposes of aggravated assault. *See* UJI 14-306 NMRA use note 1; *see also State v. Porter*, 2020-NMSC-020, ¶ 48, 476 P.3d 1201 (Nakamura, J., specially concurring) (observing that the aggravated assault statute can be read to suggest that "assaulting or striking at are overlapping concepts for purposes of the conduct punishable under the statute" (internal quotation marks and citation omitted)). We do not comment on whether the evidence in the present case supported instructing the jury with UJI 14-306.

*See* § 30-16-2. With this statutory background for context, we consider whether the conduct underlying the two convictions and punishments was unitary.

**B.      Unitary Conduct**

{12}      To answer the difficult question of "whether the acts underlying the two offenses are separated by sufficient indicia of distinctness," *see State v. Lorenzo*, 2024-NMSC-003, ¶ 6, 545 P.3d 1156 (internal quotation marks and citation omitted), we consider the statutory elements of the crimes, the language used to instruct the jury on those elements, and the factual record developed at trial, *see State v. Sena*, 2020-NMSC-011, ¶ 46, 470 P.3d 227. Having already reviewed the statutory elements, we examine the relevant portions of the jury instructions.

{13}      First, the jury was instructed that to find Defendant guilty of aggravated assault with a deadly weapon, the State had to prove the following:

> 1.      [D]efendant pointed a handgun at [Victim];
>
> 2.      [D]efendant's conduct caused [Victim] to believe [D]efendant was about to intrude on [Victim]'s bodily integrity or personal safety by touching or applying force to [Victim] in a rude, insolent or angry manner;
>
> 3.      A reasonable person in the same circumstances as [Victim] would have had the same belief; [and]
>
> 4.      [D]efendant used a firearm, a deadly weapon.

*See* UJI 14-305 Second, to convict Defendant of attempt to commit armed robbery, the jury was instructed that the State had to prove the following:

> 1. [D]efendant intended to commit the crime of armed robbery;
>
> 2. [D]efendant began to do an act which constituted a substantial part of the armed robbery but failed to commit the armed robbery.

*See* UJI 14-2801 NMRA. Third, the jury was instructed that it "must consider whether [D]efendant's acts related to the commission of armed robbery," and that "the law declares [armed robbery] to be a crime when":

> 1. That person took and carried away marijuana from [Victim] or from his immediate control intending to permanently deprive [Victim] of the marijuana;
>
> 2. That person was armed with a firearm;
>
> 3. That person took the marijuana by force or violence or threatened force or violence.

*See* UJI 14-1621 NMRA. With the statutory language and jury instructions in mind, we look to the factual record developed at trial.

{14}  In examining the factual record, we must "consider such factors as whether the acts were close in time and space, their similarity, the sequence in which they occurred, whether other events intervened, and the defendant's goals for and mental state during each act." *See Lorenzo*, 2024-NMSC-003, ¶ 6 (alteration, internal quotation marks, and citation omitted). Generally, "[u]nitary conduct is not present when one crime is completed before another is committed, or when the force used to commit a crime is separate from the force used to commit [another] crime." *Sena*, 2020-NMSC-011, ¶ 46. The relevant facts established at trial showed that Defendant

examined the marijuana, stepped out of the car while drawing a firearm, pointed the firearm at Victim through the car window, and told Victim to get out of the car. In response, Victim got out of the car, panicked, and then drew a firearm.

{15} On appeal, Defendant argues that his conduct was unitary because "[t]he same use of force with the gun forms the basis for both convictions." We agree. As we have set forth, the jury was instructed that the conduct constituting the aggravated assault with a deadly weapon occurred when Defendant "pointed a handgun at [Victim]." Likewise, the conduct that "constituted a substantial part of the armed robbery," through which Defendant attempted to "t[ake] the marijuana by force or violence or threatened force or violence," occurred when Defendant pointed the gun at Victim. Under these circumstances, Defendant's single and continuous act of pointing the gun at Victim was simultaneously the threat of force used to commit the aggravated assault with a deadly weapon *and* the overt act in furtherance of his attempt to rob Victim. *See State v. Reed*, 2022-NMCA-025, ¶ 14, 510 P.3d 1261 (determining that conduct was unitary when an element for two crimes was "satisfied simultaneously"). In the present case, we cannot discern sufficient indicia of distinctness between the conduct underlying the two convictions, and we therefore conclude that Defendant's conduct was unitary. *See Porter*, 2020-NMSC-020, ¶ 12 ("[I]f it reasonably can be said that the conduct is unitary, then we must conclude

that the conduct was unitary." (internal quotation marks and citation omitted)). The State makes four arguments against unitary conduct on appeal.

{16}     First, the State contends that the crimes occurred in "two separate places." This argument assumes that "Victim was inside the car during the attempted armed robbery and he was outside the car for the aggravated assault." But the aggravated assault jury instruction required the jury to find only that Defendant "pointed a handgun at [Victim]," with no reference to whether Victim was outside the car. In that respect, the evidence at trial showed that Defendant pointed the gun at Victim *before* Victim got out of the car and never stopped. The aggravated assault, based on menacing or threatening conduct, therefore necessarily began when Victim was still inside the car and the crimes did not occur in two separate places.

{17}     We address the State's three remaining interrelated arguments together. The State argues that (1) "when Victim drew his gun it became an intervening act which completed the attempted armed robbery"; (2) the acts' sequencing "show a defining shift in [Defendant's] intent"; (3) Defendant's conduct and words showed that his intent shifted after Victim raised his own gun. These arguments arise from the assumption that Defendant's attempt to rob Victim "was foiled by Victim's refusal and Victim pulling a gun."

{18}     We disagree that Victim's actions were an intervening event that completed the attempt to commit armed robbery and transformed Defendant's continuous

pointing of the gun from the threat of force forming the basis for the attempted armed robbery into the threat or menacing conduct that formed the basis for aggravated assault with a deadly weapon. Under some circumstances, actions apart from the defendant's may influence the double jeopardy analysis. In *State v. Comitz*, a vehicle with a siren passed the scene of an armed confrontation, which caused the "[d]efendant and his companions [to] lower[] their guns to their sides." 2019-NMSC-011, ¶¶ 39-40, 443 P.3d 1130. Our Supreme Court concluded that the defendant's conduct was not unitary because "[t]he passing siren and subsequent brief moment of repose [stood] as identifiable points marking the completion of the assaults (the initial pointing of guns) and the forthcoming batteries." *Id.* ¶ 42. In the present case, the State concedes that Victim's "refusal" did not cause Defendant to lower or stop pointing his gun at Victim. In contrast to *Comitz*, no brief moment of repose stood as an identifiable point marking the completion of the attempted armed robbery in the present case.

{19} The evidence also does not support a shift in Defendant's intent based on either Victim's actions or Defendant's conduct and words. We cannot say, under these circumstances, that Victim's act of drawing his own gun constituted an intervening event that terminated the attempted armed robbery and began the aggravated assault, nor that it was reasonable for the jury to infer that Victim's actions changed Defendant's intent from specific to general. The only evidence

related to Defendant's intent during the incident was Mr. Portalanza's testimony that Defendant told Victim to get out of the car. Defendant's verbal act of ordering Victim to get out of the car at gunpoint is consistent with *both* a specific intent to attempt to commit armed robbery and a general intent to commit an aggravated assault. We therefore conclude that the conduct underlying both convictions was unitary and proceed to the second part of the double-description test. *See Swafford*, 1991-NMSC-043, ¶ 25 (reaching the second part of the test "[o]nly if the first part of the test is answered in the affirmative").

## C. Legislative Intent

{20} We next ask whether the Legislature authorized multiple punishments for violations of the statutes at issue. *See State v. Swick*, 2012-NMSC-018, ¶ 20, 279 P.3d 747. Generally, "[i]n analyzing legislative intent, we first look to the language of the statutes to determine whether the Legislature explicitly authorized multiple punishments for unitary conduct." *Lorenzo*, 2024-NMSC-003, ¶ 13 (alteration, internal quotation marks, and citation omitted). But because none of the relevant statutes in the present case explicitly authorize multiple punishments, *see* § 30-3-2 (aggravated assault); § 30-28-1 (attempt to commit a felony); § 30-16-2 (robbery), we resort to "other canons of construction" to discern legislative intent, *see Lorenzo*, 2024-NMSC-003, ¶ 13. To do so, the parties agree that we are to employ a modified version of the test that is set forth in *Blockburger v. United States*, 284 U.S. 299, 304

(1932). *See State v. Gutierrez*, 2011-NMSC-024, ¶ 48, 150 N.M. 232, 258 P.3d 1024. The modified *Blockburger* test "demands that we compare the elements of the offense[s], looking at the [s]tate's legal theory of how the statutes were violated." *Porter*, 2020-NMSC-020, ¶ 8.

{21}    For that, we generally look first to the statutory language, the charging documents, and the jury instructions. *See id.* ¶ 19. Because we have already reviewed the statutory elements, we briefly return to the jury instructions. The jury instruction on aggravated assault that was used at trial clarifies the State's legal theory of the aggravated assault—the instruction specifically asked the jury to find that the unlawful threat or menacing conduct element was satisfied by evidence that Defendant "pointed a handgun at [Victim]." The jury instruction for attempted armed robbery provides no specific guidance as to the State's theory, and we agree with the State that "[t]he charging documents do not offer any additional insight." Thus, we next look to the testimony, opening statements, and closing arguments to ascertain the State's legal theory of the attempted armed robbery. *See State v. Begaye*, 2023-NMSC-015, ¶ 24, 533 P.3d 1057.

{22}    The State's closing argument is the clearest articulation of the legal theory for the attempted armed robbery charge that was presented at trial. First, the State argued that Defendant

> got out of his vehicle after receiving marijuana from [Victim]. He said he had $800 for a $3,500 deal, even, but . . . Portalanza says he didn't

have any money on him at all. Gets out of the vehicle and points that gun. Orders the Victim out of the vehicle.

A few moments later, the State continued to explain its theory of the attempted armed robbery as follows:

Now why the gunfire? Why the gunplay? Because there was a robbery, or attempted robbery rather. He showed up the day before asking if . . . Portalanza's people come strapped, that means do they pack guns. Do I have anything to fear from them? He's doing reconnaissance. Probing about what the danger was. Weighing the risks and the rewards. Formulating a plan. And then the next day they actually meet.

. . . .

Portalanza's testimony here was that he didn't see any money at all. No, no, no, no, no. By the day before, the dice had already been cast. They were gonna rob. They were there to rob. And they tried to rob. Things went really sideways because the Victim would not just go quietly into the night and let himself get taken advantage of. No, he responded. And the vehicle drives away. Now one might think, where'd the pot go? Well, the evidence is a little inconclusive. Where did they go? Not 100 percent positive. . . . But what certainly happened was that there was marijuana in that car. It was brought there for a drug deal. The defendant tried to rob [Victim] of it and was unsuccessful in doing so.

The State asserted in closing argument, and continues to argue on appeal, that Defendant's question about guns to Mr. Portalanza in the days before the incident was sufficient to establish the overt act element of the attempted armed robbery. We do not agree, because "[t]he overt act must be more than preparation; it must be in part execution of the intent to commit the crime." *See State v. Trejo*, 1972-NMCA-019, ¶ 8, 83 N.M. 511, 494 P.2d 173. What remains from the State's closing argument related to how Defendant "began to do an act which constituted a

substantial part of the armed robbery" was the evidence that Defendant pointed a gun at Victim.

{23} With the State's legal theory of the aggravated assault and attempted armed robbery in hand, we recap the legal elements and "plug that theory of the two crimes into the statutory scheme." *See State v. Vasquez*, 2024-NMCA-020, ¶ 28, 542 P.3d 806. Aggravated assault with a deadly weapon requires findings that (1) Defendant used a handgun and pointed it at Victim; and (2) Defendant's actions caused Victim, and would cause a reasonable person, to believe that Defendant was about to intrude on Victim's bodily integrity or personal safety by touch or applying force "in a rude, insolent or angry manner." *See* UJI 14-302. Our Supreme Court has described this crime as "assault with a deadly weapon by threat," which "criminalize[s] the creation of apprehension or fear." *See State v. Zachariah G.*, 2022-NMSC-003, ¶ 18, 501 P.3d 451. For its part, armed robbery requires that Defendant (1) was armed with a firearm; and (2) took and carried away the marijuana from Victim intending to deprive Victim of the marijuana permanently, by force or violence, or threat of force or violence. *See* UJI 14-1621. Because the armed robbery was tried as an attempt, the State only had to prove a substantial step toward the completion of the armed robbery. *See* UJI 14-2801.

{24} Viewing the evidence through this legal lens, the jury could have convicted Defendant of aggravated assault with a deadly weapon based on nothing more than

the same evidence used to convict Defendant of attempted armed robbery. The jury necessarily found that the State satisfied the unlawful threat element of aggravated assault with a deadly weapon *and* the force or threat element of attempted armed robbery by proving that Defendant pointed a gun at Victim. Even though attempted armed robbery requires the additional element of intent to deprive a person of property, nothing more than the evidence of pointing the gun was required to support the State's theory of aggravated assault with a deadly weapon. *See Armijo*, 2005-NMCA-010, ¶ 26 (observing that because "both aggravated assault and armed robbery may involve the use of force or the threat of force . . . a defendant's conviction[s] could rely on similar if not identical evidence"). The crucial difference between *Armijo* and the present case is that the jury instruction used in *Armijo* for aggravated assault required the jury to find that the defendant "struck at" the victim with a handgun. 2005-NMCA-010, ¶ 23. As a result, the threat of force, "the central element of armed robbery[, did] not subsume the element of aggravated assault— the striking at Victim." *Id.* ¶ 26. In the present case, the same threat of force grounded both crimes, and the elements of aggravated assault with a deadly weapon were subsumed within the attempted armed robbery elements. *Cf. Vasquez*, 2024-NMCA-020, ¶ 28 (reaching the same conclusion with respect to convictions for false imprisonment and aggravated assault with a deadly weapon). We therefore conclude that Defendant's right to be free from double jeopardy was violated because the

Legislature did not intend to authorize multiple punishments for Defendant's unitary conduct. *See Begaye*, 2023-NMSC-015, ¶ 35 (determining that the elements of one crime were subsumed within another when the same evidence supported elements of both crimes); *see also Swick*, 2012-NMSC-018, ¶ 24 ("The Legislature is always free to express its intent to punish the same conduct under more than one statute. However, if legislative expression is absent and one statute is subsumed by the other, then convictions for both cannot stand.").

**II.     The Conviction to Vacate**

{25}     Next, we must "determine which conviction should stand," *see State v. Schackow*, 2006-NMCA-123, ¶ 23, 140 N.M. 506, 143 P.3d 745, because "[i]f a defendant is wrongfully put in jeopardy twice for the same conduct, one conviction must be vacated," *Vasquez*, 2024-NMCA-020, ¶ 29. Generally, a double jeopardy violation "requires that the lesser offense be vacated." *State v. Santillanes*, 2001-NMSC-018, ¶ 28, 130 N.M. 464, 27 P.3d 456 (internal quotation marks and citation omitted). The parties do not dispute that if the multiple punishments violate double jeopardy protections, the aggravated assault conviction should be vacated, and we agree that is the appropriate remedy.

{26}     The parties diverge, however, on whether the firearm enhancement remains, because the required special interrogatory for the firearm enhancement was associated with the aggravated assault conviction. The State urges us to "parse out

the firearm enhancement" such that it "should not be wiped out in the instance the aggravated assault conviction is not upheld." Defendant, in reply, contends that the State's proposed double jeopardy remedy "is unsupported by the law." We need not resolve this dispute. As we explain, the special interrogatory form that was presented to the jury did not satisfy the statutory requirement to apply the firearm enhancement.

### III.    Sentencing Jurisdiction

{27}    As we have indicated, Defendant also argues that the district court lacked statutory authority to apply the firearm enhancement. Under Section 31-18-16(A), "[w]hen a separate finding of fact by the court or jury shows that a firearm was brandished in the commission of a noncapital felony, the basic sentence of imprisonment prescribed for the offense . . . shall be increased by three years." Section 31-18-16(C) provides that "[i]f the case is tried before a jury and if a prima facie case has been established showing that a firearm was brandished in the commission of the offense, the court shall submit the issue to the jury by special interrogatory." The record indicates, and the parties agree, that the jury found by special interrogatory "that a firearm was *used* in the commission of aggravated assault with a deadly weapon as charged in Count 1." Defendant contends that the firearm enhancement was improperly imposed because the jury did not make a separate finding of fact that a firearm was "brandished" in the commission of the

aggravated assault, as required by the applicable version of the firearm enhancement statute. *See* § 31-18-16. The State maintains that this argument was not preserved. Defendant responds that the error in the special interrogatory implicated the district court's subject matter jurisdiction to apply the firearm enhancement, and that our review should be de novo.

{28} We agree with Defendant that de novo review is required. A district court's sentencing power is "derived exclusively from statute." *State v. Martinez*, 1998-NMSC-023, ¶ 12, 126 N.M. 39, 966 P.2d 747. Sentencing authority is properly "considered part of [the district court's] subject matter jurisdiction." *State v. Tafoya*, 2010-NMSC-019, ¶ 7, 148 N.M. 391, 237 P.3d 693; *see also State v. Trujillo*, 2007-NMSC-017, ¶ 8, 141 N.M. 451, 157 P.3d 16 ("Because a [district] court does not have subject-matter jurisdiction to impose a sentence that is illegal, the legality of a sentence need not be raised in the trial court."); *State v. Duran*, 1977-NMCA-099, ¶ 8, 91 N.M. 38, 570 P.2d 39 (reasoning that by not requesting the special interrogatory required for the sentencing enhancement, a defendant did not waive an objection because "[i]t is not [the] defendant's obligation to see that his sentence is enhanced").

{29} Reviewing the interrogatory de novo, we conclude the statutory requirements for the firearm enhancement were not met. It is undisputed that the 2020 version of Section 31-18-16(A) was in effect at sentencing and that, in the State's words, "the

jury should have been instructed that it had to find that Defendant 'brandished' a firearm." As a result, we conclude that the district court exceeded its jurisdiction in applying the firearm enhancement to Defendant's conviction for aggravated assault because the jury did not make a separate finding of fact as to whether a firearm was brandished in the commission of that crime. *See State v. Coble-Ramirez*, A-1-CA-41394, mem. op. ¶¶ 5-6 (N.M. Ct. App. Feb. 13, 2025) (nonprecedential) (reaching the same conclusion under materially indistinguishable circumstances); *see also Duran*, 1977-NMCA-099, ¶ 10 (reversing application of a firearm enhancement because the jury was required "to determine that [the] defendant was armed with a firearm" but "did not make a separate finding of fact as to use of a firearm," which was required by an earlier version of Section 31-18-16).

{30}    The State contends that regardless of the error in the special interrogatory, the evidence supported a finding that Defendant brandished a firearm and for support, cites *State v. Ocon*, 2021-NMCA-032, ¶ 13, 493 P.3d 448. In *Ocon*, we held that "the jury's findings and the unchallenged evidence on which those findings rested show that the jury, if properly instructed, undoubtedly would have found both omitted elements." *Id.* But the *Ocon* Court reviewed for fundamental error the omission of "two essential elements" in the instructions submitted to the jury. *Id.* In the present case, we review de novo the sufficiency of a special interrogatory that was a statutory requirement to justify the imposition of a three-year sentencing

enhancement. We may infer a jury's finding from the evidence to support a jury's verdict. *See State v. Sarracino*, 1998-NMSC-022, ¶ 24, 125 N.M. 511, 964 P.2d 72 (noting that "on appeal, all disputed facts are resolved in favor of the successful party, with all reasonable inferences indulged in support of the verdict" (internal quotation marks and citation omitted)). The special interrogatory at issue, however, is the verdict that supports the firearm enhancement and that verdict found that Defendant used a firearm. The State presents no authority to establish that just because the evidence could have supported a verdict finding that Defendant brandished a firearm, we could infer that the jury would have reached such a verdict.

{31} As our Supreme Court has explained, a defendant may not be "sentenced above what is authorized *solely* by the jury's verdict alone." *State v. Frawley*, 2007-NMSC-057, ¶ 23, 143 N.M. 7, 172 P.3d 144, *superseded by statute as stated in State v. Quintana*, 2021-NMSC-013, ¶ 34, 485 P.3d 215. The term "brandish" has a different meaning than "use." *See* § 31-18-16(D) (explaining that "'brandished' means displaying or making a firearm known to another person while the firearm is present on the person of the offending party with intent to intimidate or injure a person"); *see also Zachariah G.*, 2022-NMSC-003, ¶ 19 (defining "use" for the purposes of aggravated assault with a deadly weapon). Because the special interrogatory states that Defendant used a firearm, rather than brandished it, the sentence enhancement was not authorized by the jury's verdict.

# CONCLUSION

{32}    We reverse and remand to the district court for resentencing.

{33}    **IT IS SO ORDERED.**

_____
**KATHERINE A. WRAY, Judge**

**WE CONCUR:**

_____
**MEGAN P. DUFFY, Judge**

_____
**JANE B. YOHALEM, Judge**